16-6360. Counsel. May it please the Court, Patty Gezzi and Emma Rolls for the appellant, Marlon Harmon from the Federal Public Defender's Office in the Western District of Oklahoma. Gentlemen, we have here a constitutional error that has been conceded, and not just any constitutional error, an error in the admission of a confession, Mr. Harmon's confession. Evidence the Supreme Court has said is, quote, like no other evidence, and the Court considers probably the most probative and damaging evidence that can be admitted against the defendant. In fact, the Court has said so damaging that a jury cannot be expected to ignore it even when told to do so. And it's the kind of evidence that the Supreme Court has said has a profound impact on the jury. In this particular case, that was something that was well known to these experienced prosecutors when they introduced and stressed the videotape of Mr. Harmon going into the co-defendant's interrogation room and videotaping what was said there. And then playing it for the jury at the time Battle testified, and then twice in closing argument repeating the language that was said in that interview room repeatedly. And it really is, these prosecutors knew that when they said, well, we just want to get in evidence that Jasmine Battle changed her mind about cooperation. And, you know, that's just a specious argument, because in their closing argument, it's clear what they wanted the jury to take from that video, because they specifically say incriminating statements. These aren't words of an innocent man. They're talking about Marlon Harmon's words. They're talking about his incrimination of himself. They're not talking about the cooperation of Jasmine Battle. So throughout the closing arguments, they focus on this particular evidence. And the OCCA acknowledged that it was error, and the OCCA found that it was harmless. I mean, this is not a situation where, in many of our instances, where the OCCA did not find error. And so, okay, what's the problem? Well, actually, the Court of Criminal Appeals, error was admitted in the oral argument below the Court of Criminal Appeals. I think the Court of Criminal Appeals said if there's any error, it's harmless error. So they didn't come right out and say that it was error. They did say there were incriminating statements that were made. Now, that doesn't resolve the question for this Court, because the impact on the verdicts here is a Brett question. And it's not a question that has to do with what the Court of Criminal Appeals decided. And normally, they would get deference. But in this situation, the question before this Court is whether or not that evidence had a substantial and injurious impact on the verdicts. Well, what do we do with Davis v. Ayala? I mean, why does this Supreme Court case that essentially said that the reasonableness, deference that is accorded to in the harmlessness situation still goes on after Fry? And so it still exists. So what do we do with that? So Davis did not overrule Brecht. And Davis, there is this passing statement by Justice Alito in there about the burden on a Brecht error. But that does not – he didn't – there's no overruling of any of the previous authority. And it's clear from the previous – Well, I'm sorry. I wasn't suggesting that it overruled it. What I was suggesting is that it explained that Brecht – that there is still a place for et pa deference in the harmlessness determination. And as I understand, Brecht and Davis and the circuit authority thereafter, what they were saying is that essentially, if you can't satisfy et pa deference, if you cannot satisfy the reasonableness determination as to Chapman, you will never show that there was an injurious – there's grave doubt and a substantial injurious effect on the verdict. You won't be able to satisfy Brecht. And if that's the case, then there still is a role for et pa deference in the harmlessness determination. Well, I might disagree with your reading of Davis to that broad extent. Let's just take, for instance, this particular error. The court of criminal appeals didn't actually review on the merits the impact of the error in the sentencing, which is the place that we think it had the most substantial and injurious effect. And so on that element itself, there is no deference. It's de novo review anyway. And that's where we think there was the greatest impact. These prosecutors specifically introduced this evidence knowing and actually conceding that it was tainted, but coming up with a different excuse for admitting it. And then when they get to the second stage, what do they do? They tie the crime, which they've gotten this inadmissible, unconstitutional evidence in, they tie it to the moral culpability of the offense. They do exactly, repeatedly what has been done by these particular two prosecutors, even just a few months earlier, even after Harris, even after the court of criminal appeals says that's an egregious misstatement of the law. I mean, it goes back to Eddings where the court did not allow in evidence or consider evidence of family background because it didn't tie to the offense. And what, why isn't, as it relates to the sentencing, did, was there an argument made that this error affected the sentencing? And my understanding is that was unexhausted. That there was, the LCCA did not have an opportunity to address that because the argument wasn't made. Well, the argument was made in post-conviction. Well, it was made in post-conviction, but why wasn't that too late? Because the court of criminal appeals said, we've decided this. They said in post-conviction, we've decided there was no impact on the verdict. So it definitely was exhausted and they ruled on it. And even separate from that, Judge Holmes. I may have it, I may have it mixed up, but didn't they first say you didn't raise it before and then they sort of belt and suspenders went and addressed it? No. What, in state post-conviction, this first round in Oklahoma, this argument was raised as ineffective assistance of appellate counsel for not having raised the issue. And that's appropriately raised in post-conviction. And so it was connected to the appellate ineffective assistance argument. Sorry, go ahead. So, again, the impact on the sentencing flows both because the crime is important to the sentencing, obviously. In Oklahoma's four-step process, conviction of that first-degree murder is the first thing that must happen and must be found. And then, secondly, the video, which is a picture and where pictures are worth more than words, the prosecutors were able to sort of expound on Mr. Harmon's, quote, attitude toward the killing and expound on why all this mitigation that they claimed was presented couldn't be considered because it didn't reduce the blame for the offense itself. So the offense is so connected to the sentencing that we really can't separate them. And separate from that, the court of criminal appeals is all good. Forgive me, because I'm looking back through my notes on this case, and I'm stuck on where you raised in post-conviction proceedings the impact of this error on sentencing. And if you have something you can show me or point to me, I'd like to know that, because I don't have any basis to believe that's right. It's in the ineffective assistance counsel argument when they're talking about prosecutorial misconduct not only for the moral culpability, I mean, for the moral culpability section, but also for the introduction of the video and the testimony. It's characterized as an Eighth Amendment and Fourteenth Amendment error. All right. So in addition to this moral culpability drumbeat, and that's exactly what it was here. Well, the drumbeat here was nothing, in my view, like it was in Grant. And we didn't find that to be problematic. Well, I mean, we did not find it to be a basis for a grant of habeas relief. And, I mean, in this case, the counsel directed the jury to consider mitigating evidence in a way that, frankly, was not the case in Grant. Well, actually, I think it is hard to qualitatively compare those two. It's not that hard. There's differences in Grant in here that are stronger here, because both prosecutors here said the same thing. Look at the law. The law doesn't allow you to find mitigation when it doesn't reduce your moral culpability or blame. In Grant, the argument that was improper was made in the first stage, and the second prosecutor ameliorated that somewhat by saying that other evidence could be considered. But here we don't have that, and we have specifically the law doesn't allow it. The law doesn't allow it. You can't consider this. And then when you act … Well, if you look at Judge Bass's law, Judge Bass's law would have included the mitigating factors that the defendant wanted considered. They would have said that you can consider these factors and other factors. So the jury instructions would have directed them, the jury, to know that they could consider things beyond those things that extenuated guilt, right? We don't think that second addition of the anything goes mitigator ameliorates what the prosecutor is saying. Well, Boyd is to the contrary, isn't it? Because Boyd tells us that prosecutors' comments are not given the same weight, nor should they be, as jury instructions of the court. But Boyd is quite different, because very clearly in Boyd they said the prosecutor did not do what the prosecutor did here. I'm talking about the general comment in Boyd to the effect of how you weight variables, and one variable being the prosecutor's comments, the other being the jury instructions. And those things are not given equal weight, are they? The jury instructions have greater weight than the prosecutor's argument. But what is going to stop these prosecutors? Because here they know that these are egregious comments, and they continue to make them. Well, what are they supposed to do? If it's, if the defendant points to evidence that it considers in mitigation, and the prosecutor thinks that those should not, that those arguments do not justify a lesser sentence, what are they allowed to say? Can they say, what you're saying, as I understand it, is it's forbidden for a prosecutor to say these other things shouldn't affect the penalty here. Can't they argue that? Can't they say that this mitigation evidence doesn't reduce his culpability and should not change the sentence? What can they say in response to non-culpability mitigation? What they, I can tell you what they can't say. No, no. Tell me what they can say. Okay. Because they can say. It sounds like you're forbidding them from even commenting on it. They can say mitigation has been presented. You can consider it. They have allowed, the court allows you to consider it. You can consider anything mitigation. We don't think that this mitigation has the weight to justify it outweighing the aggravating circumstances. They can say that. And what's the best argument for that? To say that this has nothing to do with his culpability? Actually, I think. That they can't say those words? No. I think you can say, as long as you say, we don't think this fits under this first definition. It's not that you can't consider it. It's not that the law prevents you from considering it. Okay. Those are different. What was their language? Was their language, you can't consider this? Look at Judge Bass's law, and then they point to only that section, the moral culpability, reduce, reduction of blame section of that instruction. That's the instruction. Six times they do this. And I'm looking at at least condensed excerpts of their comments. And they say things like, look at the mitigating evidence they proffer. It's proper. You consider it. And then later on it says, you've got this jury instruction that explains to you what mitigating circumstances are. And I'm talking about page 121, and the other was around that same area. You ask yourself, so in this situation, of course, they are, as in these prior cases, for better or worse, you've got a situation in which the prosecutors in these cases are pointing to the failure to extenuate the person's guilt and culpability for the crime. But to your point, the problem, the legal problem is preventing them from considering other things. And if the prosecutor is saying, you can consider this evidence, but I'm telling you it doesn't extenuate their guilt, that's what they're doing. Well, they're only doing that for that one section of the instruction that says there has to be some kind of nexus between the crime and the mitigating evidence. And that's just not true. They don't use the word nexus. They're not making your argument for you, though. I mean, they're not up there saying, these things aren't mitigation. Look at this piece of law. And then they say it. They're not then going to qualify it by saying, but look at all the other things that the judge said this might be relevant for. I mean, that's the defense counsel's job. What we know is that what the prosecutors said here, according to the Court of Criminal Appeals, is an egregious misstatement of the law, when they say the law only allows mitigation that reduces moral culpability. Where did they say that? Where did they say that? When I asked you that before, you said, well, they point to this instruction by the judge. But then, as Judge Holmes pointed out, at some point during the argument, they also say you can consider this other evidence. So where did they say you can't consider it, as opposed to that evidence doesn't justify a lesser sentence? The six statements that I've pointed to are where they say it. And I think if you look at the prosecutorial argument as a whole, pardon? Can you give the quotation that says or strongly implies that you can consider that evidence as mitigation? That's what I'm looking for, because what you said before, look at that instruction, I'm not sure that does it. And they do point to the instruction by name. And I'm sorry, I don't have those quotes. They're in the brief, but I don't have them right before me. And in those statements, what the prosecutor does, he does point to that part of the instruction. And then he stresses, again, only that language that's in the first part of the instruction, which is the moral culpability, the boundary, what we call the boundary language. But I think if we back away from this precise issue, because I'm obviously aware of Grant and Underwood and cases where this repeatedly comes up and prosecutors haven't changed how they approach the matter, their entire argument was set to denigrate the mitigation of Mr. Harmon, because there were other comments about how he had victimized his own mitigation witnesses, how he was making the jury feel guilty if they had the mercy that Oklahoma statute allows, that he was creating mitigating witnesses as human shields. So the entire prosecution argument was designed to denigrate mitigation, which is a Lockett era, an Eddings era, a very specific constitutional problem that this court should grant strict scrutiny to. Now, I wanted to briefly address the ineffective assessment counsel issue and focus on two particular aspects of that. And one is that there was no mental health evaluation, there was a constellation of mental disorders that this jury never heard, and also particularly the issue of sexual abuse, which clearly is something that the jury did not hear. When Mr. Harmon was six or seven years old, he complains of bleeding in his rectum to his grandmother. His grandmother thinks it's paddling at the school at first, and then it continues. And so she examines him. He's bleeding. She is concerned about it. She knows he's staying with someone who she has some suspicions about. She tries to get him treatment, tries to take him to a hospital, but because she's not the guardian, she can't even get him examined at a time when it could have been confirmed. We have, you know, it's just such a powerful mitigating factor of sexual abuse of a child that young, and the jury didn't ever hear it. It is if he agreed that that's what happened. But he didn't agree that's what happened. And she doesn't. She has no firsthand knowledge of any sexual abuse. She said, I sat down and I thought about it, and I tried to figure out what this could be. And you know what it seems to me it must be is sexual abuse. She has no firsthand knowledge of anything. Okay. Well, first of all, you don't have to have firsthand knowledge. We should look at this from how a lay jury would look at it. I'm not responding to whether it was admissible. I'm responding to the question of whether it was powerful and compelling, as you suggested, and that goes in part to, one, whether somebody saw something, I think, and also what about the fact that the person who was supposedly the victim of the sexual abuse denied it? Okay. First of all, he didn't remember it, but that we should know by now, we should know by now from all the sexual abuse of priests in the priesthood, that these allegations, these things come up much later. I mean, states have gone through and changed the statute of limitations solely because sexual abuse doesn't get reported. And we're talking about a... It's one thing to not report. It's another thing to not recall it happened or to even deny it happened. I don't read all those stories as thoroughly as perhaps you do, but I thought it was the obvious reluctance to report. But I don't know that... Well, sexual abuse is something people are ashamed of, and they are reluctant to report it. And so I think that factor is meaningless because I've really... This is evidence that lay jurors would have been impacted. I have no doubt about that. Doesn't that put his trial counsel in a tough position, though? You've got people in his family sort of pressuring counsel to make this argument. And I'm assuming this. Obviously, we don't know what the conversations were right there, but people pressuring him to make this argument. And he goes to his client and says, hey, this could be mitigating, and I'd like to put it on. The guy says, didn't happen. I don't remember anything about that. I mean, then how is he supposed to put that on? He's got to have a good faith basis for alleging sexual abuse, and he just had the only person who can really say, I don't remember it. Well, first of all, this is a situation where trial counsel never investigated the sexual abuse. So that conversation did never happen. And then second of all, I think Rompilla answers this question. And Rompilla, he said, I had a great childhood. You know, there's no problem. That did not excuse his counsel from investigating his history of abuse. You don't know. Do you know whether that investigation took place? You said that conversation never happened. How do you know it didn't happen? That's the allegation that was made in post-conviction. There was never a hearing in post-conviction. No one denied it. Was there an affidavit to say that it happened? Was there an affidavit to say that conversation took place between your client and his lawyer? And that his lawyer ignored it? No. Was, well, I mean, was there, well, how do you know? But there was the allegation that the investigation never happened. So the investigation into the sexual abuse didn't happen. But, but. I mean, you have to assume that that's. That's the first problem with Strickland. Yes. You then, so, let's say counsel should have investigated. You then have to show that there was prejudice from that failure to investigate. And the way you do that is to show if the counsel had investigated, the counsel would have discovered this. And all you can report from your own investigation is that the grandmother said he had rectal bleeding. Am I correct about that? So you didn't, you didn't find additional evidence. You don't even have his evidence at this point. Am I wrong? Is he now saying he was sexually abused? I don't think he's. There is evidence in habeas that's more complete on this. But post-conviction, the only evidence that was presented to the state court had to do with the grandmother's. Okay. But then I, you go back to what would lagers, who are not lawyers like we are, how would they treat that evidence? I think anybody that has a grandson in that situation would be thinking there's something wrong here. The mother's saying, oh, that boys just can be rough. This is a family with a rampant history of sexual abuse within it. You have Mr. Harmon's mother was sexually abused from the time she was a child. When did the evidence of the grandmother's statements about sexual abuse come out? In state post-conviction. Okay. Is there any evidence that the grandmother told the trial counsel about the rectal bleeding or the potential sex abuse? There's no evidence in the record one way or the other on that. Okay. So, I mean, it's your argument then that it was, whether there's any indicator or not, trial counsel has a duty to go check on, as one of his boxes that he's got to check, sex abuse in the past. Well, yes, definitely. I mean, they're looking into it. Is there authority for that? Is there authority that says if you don't quiz your client or relevant witnesses about past sex abuse that you've performed ineffectively? Well, of course, there's the guidelines that talk about, you know, a broader investigation into trauma, which, of course, is what sexual abuse is, in fact, a very unique kind of trauma. And so there is those guidelines. And, frankly, what capital counsel wouldn't think that it was their responsibility to investigate into that particular kind of trauma? And, on top of it, they've got red flags, because they do know that Marlon Harmon's mother was sexually abused by her stepfather from the time she was two years old and probably was the father of Marlon Harmon when he impregnated her when she was 14 years old. We also have a younger sister of Marlon's who was sexually abused by a neighbor. And the same stepfather sexually abused a younger sister of Marlon's mother. So when you have that kind of red flags in a capital trial case, it's a definitely deficient performance not to do any further investigation. Okay, so let's assume this. So assume that there was a red flag and counsel thought, well, you know, this whole family's been sexually abused. So he asks your client, were you ever sexually abused? And he says, I don't remember anything like that. Then what? Well, first of all, you have to assume the first part. But you have to assume that counsel also has a responsibility to hire a mitigation specialist who is especially sensitive to obtaining information like this, because, frankly, lawyers aren't the best to go out there and just over the phone in a meeting at the jail, were you ever sexually abused. That's not the appropriate way to investigate sexual abuse. You're not suggesting that's a standard that has to be met as a matter of ineffectiveness or not? I have to hire a mitigation expert to ask my client a question that I can ask him myself? Well, the ABA guidelines require a mitigation specialist. That's not what my question was. You can get a mitigation expert to do an investigation. That doesn't mean your mitigation expert is going to get between you and your client when you're asking a question like, have you been sexually assaulted? But those ABA guidelines specifically speak to mitigation experts having that special expertise to get this really difficult information from clients. Especially men are reluctant to admit that they were sexually abused. Let me ask this. It seems to me that a real problem here for you, unless I missed it, is there's no affidavit anywhere from the lawyer saying what he did or what he did not do. In some of these cases, you have counsel who is on the stand or, and I guess your response would be, well, I didn't have a hearing. Well, you could have had an affidavit. You didn't have an affidavit. And so what we end up with is a void of what counsel did. And at that point, Strickland kicks in. And Strickland says there's a presumption that counsel acted reasonably. And so if you've got a void and you don't have an affidavit to fill that void, where do you end up? Okay. So an affidavit is not something that is required to make a claim. I'm talking about whether you made a showing. If you don't have anything else and you don't have, we aren't going to assume that there was no investigation, are we? I think what you have to assume is when you're looking at reasonableness, you're looking at the reasonableness of the investigation. And you don't know whether there's an investigation or not. The allegations in post-conviction were made that there was not a reasonable investigation. They don't have a hearing to determine, flesh that out perhaps. You use the word allegation. It ends up being nothing more than an allegation unless you put any factual basis to it. And whether you have a hearing or not, you have an ability to put a factual basis to an allegation. One way to do that would be to have a lawyer do an affidavit and say, I didn't talk to my client about whether he had sexual assault or not. I didn't think it was necessary. Then we could evaluate the legal significance of that fact. We don't have that. Well, as I said, I think that the way to find out the answer to that is through a hearing that they've requested at State court. We've requested in Federal court and that we haven't had. I've only got 30 seconds of time, but I'd like to reserve that for my rebuttal. Now, just so you know, ma'am. Excuse me. You're not reserving rebuttal to raise new issues, are you? Okay. Okay. Good. Because we don't rush the death penalty arguments if you're still saying something substantive. Okay. Go ahead. May it please the Court. Jennifer Crabb on behalf of the warden respondent. I'd like to begin where Ms. Gezzi left off with Proposition 1, the ineffective assistance of trial counsel claim. There is absolutely no evidence that there was not an adequate investigation in this case. And not only Strickland, as Judge Holmes said, but Burt v. Titlow says that where there is no evidence as to what kind of an investigation was or was not conducted, the Court must presume that an adequate investigation was done. Ms. Crabb, could you help me? And what's your view on whether this argument about the videotape and Ms. Battle's testimony, its impact on the sentencing penalty phase, was that argument exhausted? It was not, Your Honor. In the direct appeal, and I think Petitioner admits that it was not made in the direct appeal. Yes. Yes. In the post-conviction, the allegations were prosecutorial misconduct for a plan to introduce a confession and then ineffective assistance of appellate counsel to avoid the waiver of that misconduct claim. And yes, it was made there, but that was not the admission of the videotape, which was the issue on direct appeal. And so, no, Your Honor, it is not exhausted. So turning to that claim, the scope of the claim, as I argued in my brief, the only thing that's properly before this Court is the introduction of that videotape. The prosecutor's arguments regarding that were not presented to the Court of Criminal Appeals. Obviously, they were in the record. But they were not presented in the brief to the Court of Criminal Appeals as part of the harm from the admission of the video. And so the only thing that this Court can consider is whether the introduction of the video itself had a substantial injurious effect or influence on the jury's verdict in first stage. Didn't the OCCA believe that part of that part and parcel of this was the testimony of Ms. Battle's? They did not. What they did, if you look at this proposition of error, and it would be in paragraphs 26 through 33 of their opinion, they used the words the videotape 12 times. They said the videotape, the videotape, the videotape. And in fact, they found the admission of the videotape to be harmless in part because, and I'm in paragraph 31 here, first, Battle described the circumstances of her arrest in cooperation with police during her trial testimony before the tape was admitted for the jury. Battle explained to the jury the content of the videotape without objection. Admission of the videotape itself was simply cumulative to her testimony. So if they considered that the videotape was harmless because it was cumulative to Ms. Battle's testimony, they obviously did not consider Ms. Battle's testimony to be erroneously admitted. As far as the harmlessness of this error, for first stage, we have Ms. Battle's testimony, which places Petitioner at the scene, dropping him off, coming back with blood. We have Tony Ashley, who identified Petitioner as the person leaving the store with a gun. We have Petitioner's palm print behind the counter on a piece of paper that looks like it came from Mr. Chowdhury's wallet. We have the fact that Mr. Chowdhury's credit card was used within 10 or 15 minutes after the murder, about a block from Petitioner's home. Petitioner had borrowed his girlfriend's car that day. It was a green Honda Accord. Was there any eyewitness testimony? There were multiple uses of the credit card. Did anyone identify the defendant as the person having used the credit card? That wasn't clear to me. Yes. The day after the murder, the credit card was used in Chandler, which is where Petitioner's girlfriend's mother lived. And on surveillance video, Petitioner and a friend of his can be seen on surveillance video when that credit card was used at the gas station. Any other evidence that the credit card was used multiple times? That's good evidence, but is that the only evidence tying him to the use of the credit card? The fact that the girlfriend's car was filled up with gasoline that evening. She had loaned him the car earlier in the day. When he returned the car, it was full of gas, and Mr. Chaudry's credit card had been used at a gas station right across the street, or around the block from where they lived. So there's that as well, yes. And the fact that he, that same evening of the murder, he filled two other persons' cars with gasoline, and he had no job, his girlfriend testified that he had no credit cards of his own. Petitioner also made a statement when he learned that Tyrone Boston had given the police information about the murder that he should have killed Tyrone Boston, which is evidence of consciousness of guilt. So the evidence of Petitioner's guilt was overwhelming, and admission of the confession was harmless. I take it we should be given at the deference to that, to the OCCA's Chapman determination? Yes, Your Honor. Regarding the prosecutorial misconduct claim, counsel said that the Court of Criminal Appeals found the comments here to be egregious, but on page 81 of their opinion, they actually said that the prosecutor's argument was not comparable to the argument that had been made in Harris, where they did find error. The prosecutors did not want to tell the jury that they could not consider Petitioner's mitigating evidence. In fact, they, three times they recited the entirety of the jury instruction, and on page 122, the prosecutor asked the jury to look at each one of the mitigating circumstances to see whether, and then he quoted the fairness, sympathy, or mercy language. So there was no mitigation boundary placed here. The evidence for this case is certainly weaker than Grant, where this Court found no constitutional error. If the Court does not have any further questions for me, I would ask you to please affirm the decision of the district court. Give us a second. You're leading us a little earlier than normal. As you see it right now, on the cumulative error argument, what would be within the scope of cumulative error? The videotape, Proposition 3, goes only to guilt stage. So it would, and the other two propositions go to sentencing. And so at most, there would be one in guilt stage, and that cannot be obviously accumulated with other errors, and there would be two, Your Honor, in second stage. Now, I do argue in my brief, I recognize that it's foreclosed by Cargill, but I do argue that both of the other two claims, the ineffective assistance and the prosecutorial misconduct, they do not constitute constitutional error without harm. So simply errors of counsel, no matter how egregious, the Supreme Court explicitly said in Strickland, do not amount to constitutional error without prejudice. And then same thing with prosecutorial misconduct. Misstatements by counsel that do not deprive the petitioner of a fundamentally fair trial are not constitutional error. And so I would argue for preservation purposes that those cannot be accumulated either. Take your preservation. Yes, sir. Okay. Let me ask you a couple questions about the pending motion to expand the COA. Sure. One of the arguments was ineffective assistance of counsel by not pointing to the alternative suspect. A couple points I'd like to ask you about to make sure I understand correctly. One is how strong was the evidence that there was just one person committing the offense? And second, what evidence referred to in the briefs here regarding Lancaster, was that his name? Yes. Was not presented to the OCCA. You may not be prepared on this, and I would understand that, but if you could help on those two things.  I am going from my memory, Your Honor. I didn't prepare for it. But I will tell you that the district court on page 27 said, quote, all of the evidence pointed to a single male suspect. Only one man was seen leaving the store after Mr. Chowdhury was shot. And only one man was seen immediately before and after the robbery with Ms. Battle. So that's the district court's take on the evidence supporting another perpetrator. I think that what petitioner relies on, there were some police reports attached to the first postconviction application, and there were some police reports attached to the second postconviction application. And I cannot tell you for sure which were which, to know which ones are proper to consider. But some of them did indicate that one of the police officers believed that there was an additional suspect. And they did additionally charge a John Doe in addition to petitioner. And I think, actually, they may have actually charged Christopher Lancaster, and then that was dismissed. The key word that you've used a couple times is additional. I mean, this was a felony murder charge, isn't that right? Correct, Your Honor. So if Lancaster is guilty, so what? That doesn't exculpate the defendant, does it? It does not. And I went through the evidence that supports petitioner's guilt. I think petitioner's argument would be that he may not have been the shooter. There's no evidence of that. But for death penalty jurisprudence, even that is not determinative, is it? That's correct, Your Honor. That's correct. I would point out petitioner talks about the gun that Mr. Lancaster had his girlfriend hide. He had actually used that gun to shoot Tyrone Boston. So he had a very good reason to hide that gun. Was that shooting before or after this murder? After. After the murder. After the murder, yes. It also was a semi-automatic gun. And while no one could say definitively, the police were fairly certain that a revolver was used in this crime, they searched high and low. They went back to that store and looked again to see if they could find any shell casings. And there were three shots, and they could not find a single casing. Interesting. And the other COA question, you argued that the Brady claim is procedurally barred. Give me the procedural context of that. Was that not raised until the second post-conviction proceeding before the OCCA? Are you speaking to the Brady claim with respect to Jasmine Battle's alleged deal or the Brady claim with respect to the victim impact evidence? My notes don't reflect that, but I'm pretty sure it had to do with the deal. That was not raised until the second post-conviction application, Your Honor. Okay. It's procedurally barred. And the district court went through it. And Ms. Battle actually testified that she still hoped to get additional consideration after her testimony. And I believe the prosecutor – During her trial testimony. During her trial testimony. And I believe that the prosecutor actually said so as well during closing arguments, said, you heard Ms. Battle, she hopes to even get more assistance. Thank you, Justice. Thank you, Your Honor. To return to your question about the affidavit of a trial lawyer, this Court did hold in And also, to your question, Judge Hartz, the specifics about what the prosecutor said regarding the boundary argument are on the brief at page 57. And specifically, most interestingly, when the defense counsel objects, the prosecutor very clearly says, well, it's the plain meaning of the language you gave me. That's all I'm arguing. And then he goes on to argue only that section of the moral culpability. This is a case where it wasn't a foregone conclusion that was death. We only need one juror to have been persuaded by that evidence that wasn't presented as well as the evidence that was improperly presented. There's a qualitatively difference in the death penalty in other cases, and that's one thing the Supreme Court has continued to maintain. And there's a corresponding need of reliability. That reliability is not here. This is a case that at one time the prosecutor was willing to drop the bill of particulars. We now know the victims were on board for a non-death verdict. And it's just the kind of case that the slightest thing could have made a difference to one juror. And we ask that you grant the writ. Thank you, counsel. The case is submitted. You're excused. The court will be recessed until 9 tomorrow morning.